NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0406n.06

Case No. 23-5121

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 17, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| SHERMAN KELVIN COMBS, | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellee. | ) | |
| | ) | O P I N I O N |

Before: SUTTON, Chief Judge; STRANCH and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. On November 3, 2022, a federal grand jury in the Eastern District of Kentucky charged Defendant Sherman Kelvin Combs with possession of a firearm while subject to a domestic-violence restraining order, in violation of 18 U.S.C. § 922(g)(8) and making a false statement in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6). The district court dismissed Count 1 of the indictment, reasoning that the statute is facially unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The government appealed from that decision. It argued that the district court misapplied *Bruen* and that Section 922(g)(8) is constitutional because it disarms only the irresponsible, which is consistent with historical tradition. In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court upheld the constitutionality of Section 922(g)(8)(C)(i). Finding that *Rahimi* resolves the constitutionality of Section 922(g)(8)(C)(ii), we reverse.

**I.**

On June 15, 2022, the Harrison County Family Court entered an order under Kentucky law against Combs, restraining him from harassing, stalking, or threatening his ex-wife. The order further stated that Combs could not possess or purchase firearms and warned him that doing so may violate federal law. Three days later, Combs purchased a .357 caliber revolver from a licensed dealer to whom he made a false statement—denying that he was subject to a restraining order. A week after that, Combs violated the order by texting and calling his ex-wife. When law enforcement took Combs into custody for violating the order, he informed them he had a firearm in a holster on his right hip. A federal grand jury charged Combs with one count of possessing a firearm while under a domestic violence order, in violation of 18 U.S.C. § 922(g)(8)(C)(ii), and a second count of making a material misstatement when purchasing the weapon, in violation of 18 U.S.C. § 922(a)(6).

Combs moved to dismiss the indictment, arguing that Section 922(g)(8) is facially unconstitutional under *Bruen* and, as a result, falsely stating that he was not subject to any restraining order was immaterial for purposes of Section 922(a)(6). The magistrate judge recommended in a report and recommendation that the court deny the motion in full. Combs filed objections. The district court sustained Combs's objections as to Section 922(g)(8) and dismissed that count, but it allowed the second count to proceed. The government filed an interlocutory appeal. On May 22, 2023, the district court released Combs to home detention, and on November 3, 2023, Combs pleaded guilty to the material misstatement count. The court sentenced him to time served (188 days) and two years of supervised release.

## II.

On a motion to dismiss an indictment, we review "the district court's legal conclusions *de novo* and its factual findings for clear error or abuse of discretion." *United States v. Bedford*, 914 F.3d 422, 426 (6th Cir. 2019). Similarly, we review de novo a challenge to the constitutionality of a statute. *United States v. Bowers*, 594 F.3d 522, 527 (6th Cir. 2010); *see United States v. Emmons*, 8 F.4th 454, 465 (6th Cir. 2021).

## III.

*Constitutionality of Section 922(g)(8).* The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court determined that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). The Court in *Heller* explained, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. In particular, the Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

In *Bruen*, the Court provided the framework for determining whether a firearm regulation violates the Second Amendment. 597 U.S. at 19. The plaintiffs there challenged a provision of New York's licensing law that required an applicant to prove "proper cause exists" to obtain a license to carry a gun outside of their home. *Id.* at 12 (quotation omitted). In its analysis, the Court explained that it sought to make "the constitutional standard endorsed in *Heller* more explicit." *Id.* at 31. Accordingly, a court considering such a challenge must first determine

whether the Amendment's "plain text covers an individual's conduct." *Id.* at 24. If so, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

*Bruen* offered this guidance for purposes of conducting a historical inquiry to assess the constitutionality of "modern firearm regulations." *Id.* at 26. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," though not necessarily dispositive, "that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise, if earlier generations addressed [that same] societal problem, but did so through materially different means," this also weighs against a modern regulation's constitutionality. *Id.* at 26–27. That said, where there is a "comparable tradition of regulation" from "before during, and even after the founding," the law will stand. *Id.* at 27. The inquiry into historical analogues required by *Bruen*'s second step is not a "regulatory straightjacket." *Id.* at 30. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*

The Court recently applied the *Bruen* framework in *Rahimi* and rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8)(C)(i), which bars an individual from possessing a firearm while subject to a restraining order that includes a finding that the individual poses a credible threat to another's physical safety. 144 S. Ct. at 1898. The Court reiterated *Bruen's* observation that a "historical twin" is not required, *id.* at 1903, explaining that "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 30). The Court also explained

that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 144 S. Ct. at 1899. By the Founding Era, surety laws sometimes required a spouse to post a bond against the misuse of firearms or other risks of violence. *Id.* at 1899–1900. And "a second regime" known as "going armed" laws prohibited carrying weapons that would "necessarily" lead to public violence. *Id.* at 1900–01 (citation omitted). While Section 922(g)(8)(C)(i) is not "identical" to those laws, it follows the tradition of prohibiting arms for those "found to threaten the physical safety of another." *Id.* at 1901. The Court thus concluded that "Section 922(g)(8) survives Rahimi's facial challenge [because America's] tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 1902.

*Dismissal of Count 1 of Combs's Indictment.* Relying on *Bruen*, Combs argues that the plain text of the Second Amendment protects his right to bear arms despite being subject to a protective order. *Rahimi*'s rationale forecloses Combs's argument. Because the *Rahimi* majority found "ample evidence" to support Section 922(g)(C)(i), it had no need to "decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible." *Id.* at 1898–99. But the distinction between Section 922(g)(C)(i) and Section 922(g)(8)(C)(ii) is of no consequence for purposes of Combs's indictment. Indeed, the historical tradition of surety and going-armed laws recognized in *Rahimi* applies with equal force to Section 922(g)(8)(C)(ii). For instance, both subsections of Section 922(g)(8)(C) pertain to court orders issued after providing the defendant with actual notice and opportunity to participate in a hearing. 18 U.S.C. § 922(g)(8)(A). And both subsections pertain to an order that "restrains such person from harassing, stalking, or threatening an intimate partner of such person . . . or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury." *Id.* § 922(g)(8)(B). Section 922(g)(8)(C)(ii) differs from the

crime analyzed in *Rahimi* only in terms of how it requires proof of dangerousness. Rather than requiring express findings of credible threats as with Section 922(g)(8)(C)(i), this subsection applies when the order "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury." *Id.* § 922(g)(8)(C)(ii).

The historic and "common sense" tradition that allows the disarmament of those who "pose[] a clear threat of physical violence to another" with respect to Section 922(g)(8)(C)(i) applies with equal force to Section 922(g)(8)(C)(ii). *Rahimi*, 144 S. Ct. at 1901. To be sure, both subsections reflect the same concern about preventing those deemed physically dangerous to others from using firearms. For example, Section 922(g)(8)(C)(ii)'s terminology of "physical force" contemplates the risk of violence, equivalent to Section 922(g)(8)(C)(i)'s "threat to the physical safety." *United States v. Hopper*, 28 F. App'x 376, 379 (6th Cir. 2001) ("'Violence' is defined as 'the exercise of physical force so as to inflict injury on, or cause damage to, persons or property"); *see also United States v. Coccia*, 446 F.3d 233, 241–42 (1st Cir. 2006) (explaining that "abuse" qualifies as physical force because both involve injury); *United States v. Sanchez*, 639 F.3d 1201, 1205 (9th Cir. 2011) (explaining that this law requires the order include "explicit prohibitions on physical force, abuse, or harm"); *United States v. DuBose*, 598 F.3d 726, 731 (11th Cir. 2010) (per curiam) (holding that "hurting" qualified as physical force because both could "reasonably be expected to cause bodily injury").

And both sections also limit disarmament to those found dangerous. *See Rahimi*, 144 S. Ct. at 1896–97. While Section 922(g)(8)(C)(i) satisfies that tradition with the express finding that the individual "represents a credible threat to the physical safety of such intimate partner," Section 922(8)(C)(ii) "establishes the same point by reasonable inference from the fact that a defendant is

subject to a [restraining order]" against such violent behavior. *United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012). And such injunctive relief must have resulted from a hearing required by Section 922(g)(8)(A) during which a court has concluded that "a real threat or danger of injury to the protected party" exists. *United States v. Emerson*, 270 F.3d 203, 262, 264 (5th Cir. 2001). Finally, the burden that Section 922(g)(8)(C)(ii) imposes falls within the same historic regulatory tradition as Section 922(g)(8)(C)(i). This restriction lasts only as long as the defendant "'is' subject to a restraining order," just as surety laws applied for limited durations to those adjudged likely to harm another with a weapon. *Rahimi*, 144 S. Ct. at 1902 (quoting 18 U.S.C. § 922(g)(8)).

Combs replies that the Second Amendment does not permit the government to cite dangerousness as a "superficial catchall term meaning all persons the legislature wants to disarm on the basis of public safety." He argues that going armed statutes criminalized actual dangerousness, not threatened dangerousness, and that the government has not shown any similar laws restricting firearms possession for domestic violence. He also challenges surety laws as imposing a lesser burden than Section 922(g)(8). But the Supreme Court has already considered and rejected those arguments in upholding the historical tradition behind this law. *See Rahimi*, 144 S. Ct. at 1898–1902. True, *Rahimi* does recognize that the government cannot disarm individuals simply because it deems them not to be "responsible." *Id.* at 1903. But Section 922(g)(8)(C)(ii) disarms individuals based on the threat of danger or violence *beyond* responsibility alone. *Id.* at 1899, 1901.

**IV.**

For the reasons discussed, we reverse.